UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

REBECCA N.  BEARD,    )
           )
   Plaintiff,    )
           )
 v.         )  CIVIL NO.  1:04cv202
           )
HALL DRIVE-INS, INC.,   )
           )
   Defendant.   )

<u>OPINION AND ORDER</u>

This matter is before the court on a motion for summary judgment filed on April 5, 2005 by the defendant, Hall Drive-Ins, Inc., ("Hall").  The plaintiff, Rebecca N.  Beard ("Beard"), filed her response on May 27, 2005, to which Hall replied on June 13, 2005.

For the following reasons, the motion for summary judgment will be granted.

<u>Summary Judgment Standard</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.  <u>Fitzpatrick v. Catholic Bishop of Chicago</u>, 916 F.2d 1254, 1256 (7th Cir. 1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to

grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a

"Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the

outcome is foreordained" and in such cases summary judgment is appropriate.  <u>Mason v.</u>
<u>Continental Illinois Nat'l Bank</u>, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Beard has alleged that her employer, Hall, violated the Age Discrimination in
Employment Act of 1867, as amended, 29 U.S.C. § 621 <u>et seq</u>.  ("ADEA"), the Family and
Medical Leave Act, 29 U.S.C. § 2601 <u>et seq</u>.  ("FMLA"), and the Fair Labor Standards Act, 29
U.S.C. § 201 <u>et seq</u>.  ("FLSA").[1]  Beard alleges that her employment was terminated because of
her age and because she allegedly suffered from an FMLA-qualifying condition which required
her to be absent from work for one week.  Beard further alleges that Hall terminated her
employment in retaliation for asking for FMLA leave.  Beard also alleges that Hall failed to
properly pay her overtime in violation of the FLSA.  Hall seeks summary judgment on all
claims.

The background facts pertinent to this case are as follows.  Hall is an Indiana corporation
that owns and operates the Commissary Restaurant located at 216 West US Hwy 30, New
Haven, Indiana 46774.  Don D.  Hall, II ("Mr.  Hall") has been Hall's President and part owner
for approximately two years.  Since May 1988, Dale Hogle ("Hogle") has been the Commissary
Restaurant Manager.  Beard cooked breakfast at the Commissary Restaurant and Hogle was
Beard's direct supervisor for several years and during all the time periods relevant to Beard's
Complaint.

---

[1] Beard's complaint contains a claim under the Indiana Wage Payment Statute, Indiana
Code Section 22-2-5 <u>et seq</u>.  However, in her response to the motion for summary judgment,
Beard acknowledges that, since she is seeking payment for overtime wages, her exclusive
remedy lies with the FLSA.  Thus Beard concedes that her state law claim should be dismissed.

4

Typically, Beard was scheduled to work on Tuesday through Saturday of each work week.  Sundays and Mondays were Beard's regularly scheduled days off.  From January 2000 to September 2001, Beard would arrive at work, turn on the grill, and then clock in between 4:00 and 4:30 a.m.   Pre-September 2001, Beard admits that her clock-in time was the actual time that she arrived at work.  Prior to 2001 and after, Beard personally checked her time cards to ensure that her hours were properly totaled.  Beard would actually calculate her time and write the amount of time she worked each day on the time cards.

In September 2001, Beard testified that Hall management reduced everyone's hours at the Commissary Restaurant, including her own.  From that time forward, Beard was scheduled to begin working at 4:30 a.m.  Hall posted Beard's work schedule in Hogle's office to inform employees of their scheduled work hours.  At that time, Hall's Commissary Restaurant opened for breakfast at 6:00 a.m.  Hall allotted one and a half hours for Beard and the other breakfast cooks to prepare to open.  From September 2001 forward, Beard's time cards reflect that she began clocking in approximately a half hour later than she did pre-September 2001.

According to Beard, she spoke with Hogle and voiced her concern that she could not possibly wait to clock in at 4:30 a.m. and complete all of the preparatory work necessary for the kitchen.  Beard asserts that Hogle stated that he understood and agreed with Beard that it would be impossible to prepare for the breakfast shift if Beard clocked in at 4:30 a.m.  According to Beard, in order to comply with the order not to clock in, Beard told Hogle that she would come in at 3:30, but not clock in until 4:30 a.m.  Beard further asserts that on Saturdays, she arrived at 3:00 a.m. to prep for her day.  Beard asserts that Hogle knew she continued to arrive at work at least by 3:30 a.m. every work day, and that Hogle would leave special orders for the dairy

5

delivery person with Beard knowing that she would be there early when the dairy truck arrived.

The record reflects that on Wednesday, September 10, 2003, a managers' meeting occurred at Hall's New Haven location during which Mr. Hall addressed certain issues. Hogle attended that meeting along with all the other managers. During the meeting, Mr. Hall focused on timely food preparation, not over-prepping, portion and quality control. Mr. Hall used a bucket containing a large quantity of destroyed, inedible, deep-fried sausages he found in the Commissary Restaurant that morning as an example of why it is so important to grill the sausages and not deep-fry them. Mr. Hall also used other props during this meeting to demonstrate to the managers proper cooking and preparation procedures. During the meeting, Mr. Hall also emphasized to the managers that the cooks should stay only six to eight orders of sausage ahead, cooking on the grill, to decrease the wait time on orders while still maintaining sausage freshness. Additionally, he focused on conserving energy in the restaurants to help minimize operating expenses.

Shortly after the managers' meeting, Hogle reminded the kitchen staff present in the Commissary Restaurant that day to not deep-fry the sausages. Hogle told them to grill the sausages and to stay only six to eight orders of sausage ahead on the grill. Since Beard had already left the restaurant prior to the managers' meeting and Hogle was not scheduled to come in to work the following morning, Hogle left a note on Beard's time card, notifying her what he had told all the other cooks that day -- don't deep fry sausage and don't get far ahead on the sausage.

When Beard came to work on September 11, 2003, she received Hogle's note informing her not to deep-fry the sausages or to cook them in excessive amounts. Hogle confirmed with

Beard that she had received the note he had attached to her time card two days before. All of the Commissary Restaurant cooks were told what Hall management expected from them regarding how to cook sausages and the proper quantity to cook

After Beard had received the instructive note on her time card on September 11, 2003, and after her meeting with Hogle confirming that she had received Hall management's directives on proper sausage cooking practices, Beard continued to deep fry sausages. Specifically, Beard deep-fried sausages on Saturdays between September 10 and September 26, 2003.

On Thursday, September 25, 2003, Beard left work early and went home. Beard telephoned Hogle and told him that she was sick and that she would ask Cour to work for her the following day, Friday, September 26, 2003. On September 25, 2003, some time after Beard had left the Commissary Restaurant, Mr. Hall arrived. While at the Commissary Restaurant, Mr. Hall allegedly found, in the breakfast cooler, a bucket containing an excessive amount of overcooked, completely demolished sausages. Mr. Hall allegedly suspected that Beard may have been the one who improperly cooked the sausages because he had recently been told by another Hall employee that Beard had been deep-frying sausages again. Mr. Hall asked the cooks present that day if any of them had cooked the sausages he found. Beard had already left, but everyone present denied cooking the sausages, including Cour. Because Thursday was Hogle's day off Mr. Hall did not speak to Hogle about this incident until the next day, September 26, 2003.

On the morning of September 26, 2003, Mr. Hall returned to the Commissary Restaurant and spoke with Hogle. Hall allegedly showed Hogle the bucket of overcooked sausages and asked Hogle if he had instructed Beard on the proper sausage cooking practices after the

September 10 manager's meeting.  Hogle assured Mr.  Hall that Beard had been instructed to not deep-fry sausages and to not get so far ahead on the sausages.  Mr.  Hall allegedly determined that morning that Beard's employment should be terminated due to her refusal to follow management's instructions.  Mr.  Hall allegedly had no knowledge regarding why Beard was not at the Commissary Restaurant during his visit there on September 25, or September 26, 2003.  Beard has admitted to deep-frying sausages at times, when the restaurant was especially busy at breakfast time, but denies ever leaving a bucket of over-cooked sausages at the restaurant.

Beard saw Dr.  Lawrence Wuest, a family physician, on September 26, 2003, due to painful swelling in her legs.  After her appointment, Beard allegedly called Hogle to tell him that she would have to be absent from work for a few days so that the swelling in her legs could subside.  Hogle denies that Beard called him to inform him of her meeting with the doctor.  Although Beard implies that she was required by her doctor to take off work for a week, the record is clear that Dr.  Wuest left it up to Beard's discretion as to when she could return to her job, which required up to 10 hours of standing per shift.  (Beard Dep at 32-33, Wuest Dep.  at 22).

In support of its motion for summary judgment, Hall first claims that Beard's ADEA claim fails as a matter of law because Beard has no direct evidence of discrimination, cannot establish a prima facie case, and cannot show pretext.  In response, Beard claims that she has the following direct evidence of discrimination: (1) when Beard turned 60, she was asked by Mr.  Hall if she planned to retire; (2) Mr.  Hall and Beard were the same age, but when Beard turned 61, Mr.  Hall asked her to explain to him how it felt since he did not feel 61, and (3) Mr.  Hall referred to one of his waitresses as "that old bag".  Beard asserts that while these comments,

which in and of themselves may not be sufficient to create a triable issue, should be coupled with other facts and evidence regarding Beard's claim of age discrimination which include: (1) Beard asserts that she told Hogle the results of her appointment with Dr.  Wuest - that she was suffering from arthritis and needed time off to let the swelling in her legs decrease; (2) Beard and her husband were covered under Hall's medical insurance which was administered as a self-funded, very expensive plan; (3) Beard's husband had been hospitalized approximately three weeks prior to Beard's termination; (4) Mr.  Hall explained that the restaurant business in Fort Wayne was "flat" and that he closed one restaurant and sold another one in the year following Beard's termination; (5) Hogle said that he did not hire someone to replace Beard, he merely moved Cour into Beard's breakfast shift because the restaurant was overstaffed; and (6) Cour, who was 16 years younger than Beard, repeatedly told her in the six months preceding her termination that he wanted her work shift.  Beard further claims that she has evidence that Hall has given less than honest answers regarding its decision to terminate Beard: (1) Mr.  Hall changed the reasons for Beard's termination from her alleged total failure in the kitchen to just failing to properly cook a limited amount of sausages; (2) Mr.  Hall changed his story given to the EEOC regarding watching Beard cook with the bucket of 42 sausages next to her to his deposition testimony wherein he stated that he discovered the sausages in the cooler; (3) Mr.  Hall discussed Beard's termination with Hogle between 10:00 and 11:00 a.m. on September 26, 2003, yet Hogle told Beard at 2:00 p.m. the same day that it would be "no problem" for her to be off work until September 30, 2003; (4) Hogle first stated that Beard was terminated in the morning of September 26, 2003, and then later stated she was terminated that afternoon; (5) disciplinary write-ups were allegedly given to Beard during her course of employment, but were unavailable

because they had been stolen.

The Seventh Circuit has long recognized that "when proceeding under the direct proof method, in order for allegedly discriminatory remarks to 'qualify as direct evidence of discrimination, the plaintiff must show that the remarks were related to the employment decision in question.'" Robin v. Espo Engineering Corp., 200 F.3d 1081, 1089 (7th Cir. 2000). Hall asserts that all of the comments set forth above are insufficient to preclude summary judgment given there lack of: (1) temporal proximity to Beard's discharge on September 26, 2003 and (2) causal relation to the discharge decision making process. See Espo Engineering Corp., 200 F.3d at 1089 (finding that "because [employer's] isolated, age-related comments were not contemporaneous with the discharge or causally related to the discharge decision making process, they are insufficient to create a triable issue of material fact regarding age discrimination") (citation omitted).

With respect to Beard's allegation that "when [she] turned 60, she was asked by [Mr. Hall] if she planned to retire", Hall notes that it denies this comment was made but even if it were true, the record establishes that the comment was temporally remote. Beard was born on March 13, 1942 and her own deposition testimony regarding the timing of the alleged comment establishes that the comment occurred on approximately March 13, 2002, more than one and a half years before Mr. Hall's decision to terminate her employment. Beard also testified that when Hogle informed her that Mr. Hall had decided to terminate her employment, he said that it was because of "those damn sausages.".

With respect to Beard's allegation that Mr. Hall asked her what it felt like to be 61, Hall points out that Beard's own testimony shows that the alleged comment occurred more than six

months before her discharge.  Hall thus contends that the rather innocuous statement is

temporally remote and otherwise not causally related to Beard's discharge.

With respect to the "old bag" comment, Hall points out that Beard testified that the

employee to whom the comment was directed is at least seventy years of age, and is still working

at Hall's Commissary Restaurant today.[2]

This court agrees with Hall that the three examples of isolated, temporally remote

comments allegedly made by Mr.  Hall do not create a triable issue of material fact regarding age

discrimination.  See Espo Engineering Corp., 200 F.3d 1089 ("[w]ithout any evidence presented

by [plaintiff] to the contrary, these statements ['old S.O.B.' and 'getting too old'], the 'old

S.O.B.' comment in particular, appear to have been made in the context of random office banter.

Indeed, 'conversational jabs in a social setting' do not constitute evidence or intent to fire for an

impermissible reason.").

Beard's other "evidence" of age discrimination are merely random events that have no

apparent connection to her discharge.  For example, it is not unusual for an employee to take one

week off for health reasons and there is no evidence that Mr.  Hall knew Beard was on sick leave

when he terminated her.  Likewise, there is no evidence that Mr.  Hall knew that Beard's

husband was ill or that his illness significantly impacted Hall's insurance costs.  As for Mr.

Hall's statement that the business was "flat", it was no secret that the restaurant business was not

thriving at that time, which is why Mr.  Hall was cutting his employees' hours, trying to cut back

---

[2]  Hall claims that Beard is attempting to portray Hall, and Mr.  Hall in particular, as
being opposed to an older workforce.  Hall points out that as of December 31, 2004, there were
fifty employees over the age of sixty working at Hall of which twelve were over the age of
seventy.

on operating expenses, and getting upset with employees who wasted food.  Rather than being evidence of discrimination, this is evidence of the realities of Mr.  Hall's business, which Beard was aware of when she unwisely chose to disregard his instructions.

With respect to Beard's assertion that Mr.  Hall changed his story during this litigation, it is clear that this is not true.  Mr.  Hall did allege several problems with Beard's work in his EEOC response, all of which were not ultimately used as defenses in this federal case.  However, Mr.  Hall did not add any new alleged deficiences, but merely dropped the ones that he did not have sufficient evidence to support.  This is called stragegy, not lying.

Beard argues that even if she has not presented direct evidence of discrimination, she has still made out a prima facie case of age discrimination.  Under the familiar McDonnell Douglas framework, Beard must establish a prima facie case of age discrimination by a preponderance of the evidence.  Cerutti v.  BASF Corp., 349 F.3d 1055, 1061 (7th Cir.  2003); Wilson v.  AM General Corp., 167 F.3d 1114, 1119 (7th Cir.  1989).  If Beard is able to meet this burden, then Hall may present evidence of its legitimate, non-discriminatory reasons for its actions.  Cerutti, 349 F.3d at 1061; Wilson, 167 F.3d at 1119.  Then, to avoid summary judgment, Beard must establish by a preponderance of the evidence that Hall's asserted reason for its actions are a mere pretext for discrimination.  Cerutti, 349 F.3d at 1061; Wilson, 167 F.3d at 1119.

To establish a prima facie case for discriminatory termination under the ADEA, Beard must present enough evidence to create a triable issue of fact on each of the following elements: (1) she is a member of the class protected by the statute; (2) she reasonably performed to her employer's expectations; (3) she was terminated; and (4) the position remained open or she was replaced by someone substantially younger.  Lesch v.  Crown Cork & Seal Co., 282 F.3d 467,

472 (7th Cir.  2002); Radue v.  Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir.  2000).

Hall argues that Beard cannot meet the second element of a prima facie case, and that she was not meeting Hall's legitimate performance expectations at the time of her discharge.   The Seventh Circuit has declared that "the 'legitimate expectations' element in the ubiquitous burden-shifting formula of McDonnell Douglas [is critical]." Peele v.  Country Mut.  Ins.  Co., 288 F.3d 319, 328 (7th Cir.  2002).   In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination." Peele, 288 F.3d at 329 (7th Cir.  2002)(citing Karazanos v.  Navistar Intern.  Transp.  Corp., 948 F.2d 332, 336 (7th Cir.  1991)).

Hall contends that the record reflects that during the months and weeks leading to Beard's discharge, Beard admittedly engaged in improper sausage cooking practices.  Hall reiterates that Hall management had established during its September 10, 2003 managers' meeting that deep-frying sausages and cooking too many ahead constituted improper cooking practices and would no longer be tolerated.  On September 11, 2003, Beard received written instructions from Hogle, her direct supervisor, informing her not to deep-fry sausages and to stay only a few orders ahead on the grill.  On September 12, 2003, Beard received verbal instructions from Hogle regarding the same.  Despite written and verbal instructions by her direct supervisor, Beard deep-fried sausages on at least two consecutive Saturdays following Hogle's instructions. Beard's justification for deliberately disobeying Hall management's directives was that "[she] had to do it -- to look out for [herself]."  Beard has acknowledged that she understood Hall's expectations regarding proper sausage cooking practices and that she had failed to meet those

13

expectations at least twice within the two weeks prior to her discharge.  Beard, in her response, merely states that even though Hogle knew that Beard was continuing to deep-fry sausages on Saturdays, he never counseled her to stop.  Nevertheless, the fact remains that Beard knew she was not supposed to deep-fry sausages, but continued to do so.   Given this undisputed fact, it is clear that Beard cannot establish that she was performing her job in a satisfactory manner.

Hall next argues that even if Beard could make out a prima facie case, Hall has provided a legitimate, non-discriminatory reason for discharging Beard.  The law is clear that "pretext" is defined as a lie or a phony reason for an employment decision.  Baron, 195 F.3d at 341.  "Pretext requires more than a showing that the business decision was 'mistaken, ill considered or foolish.'" Franzoni v.  Hartmarx Corp., 300 F.3d 767, 772 (7th Cir.  2002).  Moreover, so long as the employer "honestly believed" the reason given for the action, pretext has not been shown." Id.  An employee may refute a proffered reason for discharge by demonstrating that : "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge."  Wolf v.  Buss (America) Inc.  77 F.3d 914, 919 (7th Cir.  1996).

Hall states that in the present case, it terminated Beard's employment due to her repeated failure to follow its management's cooking instructions.  Beard claims that this stated reason is pretext, and disputes that Hall found a bucket of overcooked sausages in the cooler on the morning of September 25, 2003.  Beard has testified that she did not leave a bucket of sausages in the cooler and did not see any such bucket during her frequent trips to the cooler on the morning in question.  Cour has also testified that he did not see the sausages that Mr.  Hall allegedly found in the cooler.  However, the record is clear that Hogle personally saw the bucket

14

of sausages that Mr. Hall had found in the breakfast cooler. In fact, when he called Hogle to inform her that she was being terminated he told her it was because of "those damn sausages". (Beard Dep. at 25).

It is clear that all the objective evidence presented supports that Hall, in good faith, determined that Beard had improperly deep-fried an excessive amount of sausages. Even if Mr. Hall's decision to terminate Beard's employment was mistaken, ill-considered or foolish, it was based on his honest belief that Beard had deep fried the excessive amount of sausages found in the bucket on the morning of September 25, 2003, and had been deep-frying sausages after being informed to only cook them on the grill. This court "does not sit as a super-personnel department that reexamines an entity's business decisions." Andree v. Siemens Energy and Atomation, Inc., 90 Fed. Appx. 145, 151 (7th Cir. 2003)(citing Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)). Rather, the court's inquiry is limited to whether Beard has set forth a "legally sufficient evidentiary basis for a reasonable jury" to disbelieve the reasons proffered by Hall for her discharge. See Andree, 90 Fed. Appx. at 151; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Accordingly, as Beard has insufficient direct evidence of age discrimination, had not presented a prima facie case, and has not shown pretext, summary judgment will be granted in favor of Hall on Beard's age discrimination claim.

The court will now turn to Beard's FMLA claims. Hall has taken the position that Beard's FMLA claims fail as a matter of law because she cannot establish that she suffered from a serious health condition. Under the FMLA, eligible employees may take twelve work weeks of leave within a twelve month period in the event that the employee suffers from a "serious health

15

condition that makes the employee unable to perform the functions of the position of such employee." Haefling v. UPS, 169 F.3d 494, 498 (7th Cir. 1999)(citing 29 U.S.C. § 2612(a)(1)(D)). A "serious health condition" is defined under the FMLA as "an illness, injury, impairment, or physical or mental condition that involves ... inpatient care ... or continuing treatment by a health care provider." See Haefling, 169 F.3d at 498. In-patient hospitalization involves an overnight stay in a hospital and related time of incapacity after such hospitalization. 29 C.F.R. § 825.114(a)(1). In order to constitute "continuing treatment" by a health care provider, there are five alternatives that may be met:

a)   Absence plus treatment -- the illness must result in a period of incapacity of more than three (3) consecutive calendar days; and
   i)   involve treatment two or more times with a health care provider; or
   ii)   involve treatment by a health care provider on at least one occasion  and result in a regimen of continuing treatment. 29 C.F.R. § 825.114(a)(2). A "regimen of continuing treatment" includes things like prescription medication or therapy, but does not include things like over-the-counter medications, bed rest or "drinking fluids." 29 C.F.R. § 825.114(c).

b)   Pregnancy -- Any period of incapacity due to pregnancy, or for prenatal care.

c)   Chronic Condition -- Any period of incapacity or treatment for such incapacity due to a chronic serious health condition which:
   i)   Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
   ii)   Continues over an extended period of time (including recurring episodes of a single underlying condition); and
   iii)   May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)

d)   Permanent or Long Term Incapacity -- A period of incapacity which is permanent or long term due to a condition for which treatment may not be effective. Examples include Alzheimer's, a severe stroke, or the terminal

stages of a disease.

e)      <u>Absence and treatments</u> -- Any period of absence to receive multiple
        treatments (including any period of recovery therefrom) by a health care
        provider or by a provider of health care services under orders of, or on
        referral by, a health care provider, either for restorative surgery after an
        accident or other injury, or for a condition that would likely result in a
        period of incapacity of more than three consecutive calendar days in the
        absence of medical intervention or treatment, such as cancer
        (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney
        disease (dialysis).  29 C.F.R. § 825.114

At the conclusion of a qualified FMLA leave period, an employee is entitled to

reinstatement to the position the employee previously held or to an equivalent one with the same

terms and benefits that existed prior to the exercise of leave.  <u>Haefling</u>, 169 F.3d at 498 (citing

29 U.S.C. § 2614(a)).  The FMLA further provides that it is "unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided

under" the FMLA.  <u>Haefling</u>, 169 F.3d at 498 (citing 29 U.S.C. § 2615(a)(1)).  An employee

bears the burden of proving that he or she was entitled to FMLA leave.  <u>Levine v.  The</u>

<u>Children's Museum of Indianapolis, Inc.</u>, 61 Fed.  Appx.  298, 300 (7th Cir.  2003).

To succeed on her FMLA claim, Beard must prove: (1) that she is an eligible employee

under the FMLA, 29 U.S.C. § 2611(2); (2) that Hall is an employer under the FMLA, 29 U.S.C.

§ 2611(4); (3) that she was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); and (4)

that Hall improperly denied her leave under the FMLA, 29 U.S.C. § 2615.  Hall admits that

Beard can satisfy the first two requirements of an FMLA claim, but insists that she fails to meet

the third and fourth requirements.

Beard must prove that her medical condition that led her to leave work early on

September 25, 2003 and to see Dr.  Wuest on September 26, 2003 was a "serious health

17

condition" within the meaning of the FMLA.  Since Beard was not hospitalized at least overnight for her condition, the key determination is whether her medical condition qualifies as a "serious health condition" under one of the other five alternatives set out in the regulations which delineate those situations which would constitute "continuing treatment by a health care provider."

For Beard to establish that her leg swelling/arthritis satisfied the requisite period of absence accompanied by continued treatment by a health care provider, she must make a threshold demonstration that her condition resulted in a period of incapacity requiring absence from work or an absence from or an inability to perform daily activities for more than three consecutive calendar days.  Haefling, 169 F.3d at 499.  Beard must then show that she received continuing treatment as a result of this incapacity.

In his deposition, Dr.  Wuest testified that on the first date that he saw Beard for her leg condition, he did not consider it an FMLA problem, but acknowledged that a non-FMLA problem could progress and become an FMLA problem.  (Wuest Dep.  at 25).  Beard has testified that Dr.  Wuest left it up to her discretion as to when to return to work and as to what types of activities she could do without aggravating the swelling in her legs.  (Beard Dep.  at 32-33; Wuest Aff.  at ¶¶ 3-4).  Thus the record is clear that Beard's condition did not require her absence from work for at least three consecutive days, and she was not suffering from a "serious medical condition" for FMLA purposes.  Rather, Beard suffered from a minor ailment (leg swelling), such that is typically resolved quickly using an employee's regular sick leave, and does not involve the need for the protections of FMLA leave.

In any event, even if Beard could establish that she qualified for FMLA leave, she must

still establish a prima facie case of retaliation under the FMLA.  To establish a claim for

retaliation under the FMLA, Beard must first show that "after engaging in protected conduct,

only she, and not any similarly situated employee who did not engage in protected conduct was

subjected to an adverse employment action even though she was performing her job in a

satisfactory manner."  See Buie v.  Quad/Graphics, Inc., 366 F.3d 496, 503, n.3 (7th Cir.  2004).

Upon the establishment of a prima facie case, the burden shifts to Hall to articulate a legitimate,

non-discriminatory reason for the adverse employment action.  King v.  Preferred Tech.  Group,

166 F.3d 887, 892 (7th Cir.  1999).  If Hall meets this burden of production, the presumption

raised by the prima facie case is rebutted and drops from the case.  Id.  Beard would then have

the opportunity to show that the proffered reason was not the real reason for Hall's decision to

terminate her employment and that her taking FMLA leave was, in fact, the real reason for the

September 26, 2003 discharge.  Id.  At all times throughout this burden-shifting approach, Beard

retains the ultimate burden of persuasion.  Id.

     In the present case, as discussed above, it is clear that Beard was not performing her job

in a satisfactory manner, as she admittedly continued to deep-fry sausages after being instructed

to discontinue that cooking practice.  Moreover, also as discussed above, even if Beard had

presented a prima facie case, Hall has successfully rebutted that case with a legitimate,

nondiscriminatory reason for Beard's discharge.  Beard has no evidence whatsoever tending to

show that this stated reason was pretextual.  Therefore, the court will grant summary judgment in

favor of Hall on Beard's FMLA claims.

     Next, the court will discuss Beard's FLSA claims.  The FLSA provides that persons may

not be employed for more than forty hours a week without receiving overtime pay in the amount

of one and a half times their regular pay.  29 U.S.C. § 207(a).  Beard claims that she is entitled to overtime compensation for the hours she worked "off the clock" prior to the actual clock in time for her shift.  The undisputed evidence shows that Hall cut Beard's hours in September 2001 from approximately 52 to 43.  At this time Hogle put a sign on the time clock instructing employees not to clock in before their scheduled shift.  (Beard Dep.  at 46-47, 50-51, 150).  Beard acknowledges that she received overtime pay for the two or three hours per week in excess of 40 hours that registered on her time card.  According to Beard, however, when her hours were cut back she spoke with Hogle and told him that she could not prepare for her shift without arriving at 3:30 a.m.  (Beard Dep.  at 47-48).  Further, Beard discussed with Hogle her plan to continue to arrive at work by 3:30 a.m., but not clock in until her shift was scheduled to begin at 4:30 a.m. Beard has presented evidence that the dairy delivery person, Larry Hoffman, confirmed that Beard was nearly always present when he made his deliveries between 3:30 and 4:00 a.m.  Beard claims that she must be paid for any actual time worked, even if she had not clocked in, and even if Hall had not agreed to pay her for the extra time she voluntarily worked.

Beard's position is ridiculous.  It is clear that for business reasons, Hall determined that it was necessary to cut his employees' hours.  Obviously, the reason for cutting their hours was so that Hall did not have to pay them as much and could thereby save on salary expenses.  Beard decided on her own that she needed more time to prepare for breakfast, and she obtained at least implicit permission from Hogle to arrive early, but not clock in until her actual shift started at 4:30 a.m.   This was for Beard's convenience, so she wouldn't feel as rushed during the start of her shift, and there is absolutely no evidence that Mr.  Hall agreed to pay Beard for any work she performed prior to the start of her shift.   Nor is there any evidence that Beard was required to

arrive at work prior to her clock-in time.  It is clear that Beard knew that she was not entitled to any pay for work performed prior to her clock in time and that she asked Hogle if she could arrive at work early for her own convenience.  Employees cannot voluntarily show up for work early and expect to be paid for work performed prior the start of their shift.  Prior to the start of their shift (or other required work times) employees are not "employed", and thus are not entitled to the protections of the FLSA for work they perform during their free time.   In the present case it is undisputed that Beard was properly paid for all work performed during her approved shift and approved working hours, and the court finds her FLSA claims to be completely meritless.  Accordingly, summary judgment will be granted in favor of Hall.

Conclusion

On the basis of the foregoing, Hall's motion for summary judgment is hereby GRANTED.


Entered: July 20, 2005.


s/ William C.  Lee
William C. Lee, Judge
United States District Court